UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF LOUISIANA

IN RE:                                                    CASE NO:

**MARY T. OSBORNE**                                       **99-11735**

DEBTOR                                                    CHAPTER 13

### MEMORANDUM OPINION

Debtor Mary Osborne asks the court to sanction Homeside Lending, Inc.[1] and its counsel, Stacy C. Wheat, for alleged misconduct in connection with a motion for relief from automatic stay.[2]  The gist of the debtor's complaint is that Homeside's lawyer signed and filed a false affidavit to obtain relief from the automatic stay based on the debtor's alleged failure to comply with the terms of a consent order.

PROCEDURAL HISTORY

The events leading directly to this dispute began unfolding April 24, 2002, when Homeside's counsel sought *ex parte* relief from the automatic stay.[3]  The court granted the motion on May 9, 2002,[4] and denied Osborne's later motion to set aside that order.[5]

---

[1]  Washington Mutual ("WAMU") acquired Homeside in 2004.

[2]  This case already has made its way to the United States Fifth Circuit Court of Appeals, and resulted in a reported decision with which the court assumes all parties are familiar.  *In re Osborne,* 379 F.3d 277 (5th Cir. 2004).

[3]  P-93.

[4]  May 9, 2002 order granting stay relief (Exhibit R-29) (P-95).

[5]  October 30, 2002 order denying Motion to Vacate Order Granting Relief from Automatic Stay (P-106).

The Fifth Circuit reversed the district court's affirmance of the October 30, 2002 order, and remanded the matter for further proceedings.[6]

After the Fifth Circuit decision, on remand, the parties engaged in a lengthy period of unsuccessful settlement negotiations and a failed mediation to try to resolve the dispute.  Eventually, Osborne moved for sanctions against Homeside and its counsel under 11 U.S.C. §§105 and 362(h), 28 U.S.C. §1927 and Fed. R. Bankr. P. 9011.[7]  The motion alleged that Homeside obtained stay relief by filing a false affidavit and repeatedly filing false pleadings.  On Homeside's motion for partial summary judgment[8] the court dismissed the debtor's claims under Rule 9011 and 11 U.S.C. §362.  The court declined to dismiss Osborne's claims under 11 U.S.C. §105 and 28 U.S.C. §1927, and tried the remaining claims after mediation failed.

## FACTS

### I.    Mortgage Defaults and Stay Relief

Mary Osborne bought a house from her father in March 1997 using mortgage financing from Homeside.  Homeside sued to foreclose after Osborne fell behind on her mortgage payments, and Osborne responded by filing a chapter 13 petition on August 30, 1999.  Osborne defaulted on her mortgage obligation to Homeside in October 1999, several weeks before the court confirmed her chapter 13 plan on December 2, 1999.

---

[6]  To summarize, the Fifth Circuit held that Homeside was not entitled to relief from the automatic stay because Osborne had fulfilled the terms of her post-petition agreement with the mortgage lender.  It also concluded that Homeside had improperly obtained stay relief as a result of a declaration of default that was based on "faulty evidence."  *Osborne*, 379 F.3d at 284.

[7]  Motion for Sanctions, filed on January 18, 2005 (P-141).  Osborne amended her motion for sanctions on March 29, 2005 (P-153).

[8]  P-206.

The confirmed chapter 13 plan provided that Osborne would retain her house, cure the existing mortgage defaults over the term of the plan and make future mortgage payments directly to Homeside.  Homeside referred the Osborne matter to Shapiro & Mentz for the first time on December 6, 1999, a few days after the order confirming the plan.[9]  Stacy Wheat then filed a motion for relief from stay on Homeside's behalf on February 4, 2000.

Stacy Wheat handled Shapiro & Mentz's litigation and bankruptcy matters, including mortgage foreclosures.  Wheat testified that an average of between 30 and 50 files crossed her desk every day.  She relied on two or three employees to prepare the motions for relief from the automatic stay, select a hearing date, then file and serve the motions she had signed.[10]  Wheat testified that she had handled thousands of motions for Homeside between 1991 and 1999, but Homeside never asked to review draft pleadings or stay relief motions before she filed them.  Instead, the evidence demonstrated that Wheat, as Homeside's lawyer, assumed that the information Homeside furnished her office was correct, and therefore that the statements in documents she filed on Homeside's behalf were accurate.

Judge Louis Phillips granted Homeside's February 2000 stay relief motion in an April 20, 2000 order, but later vacated that order, instead requiring that the debtor make

---

[9]   Stacy Wheat was at all times relevant to this opinion an associate attorney at Shapiro & Mentz in Metairie, Louisiana.  Shapiro & Mentz is a "branch" or franchise of the Law Offices of Gerald Shapiro. The firm handles residential real estate foreclosures and the bankruptcies that stem from those foreclosures.

[10]   Shapiro & Mentz did not maintain its own files with loan histories and other information relating to mortgage loans involved in the cases Homeside referred to the law firm.  Homeside furnished that information to the law firm whenever Wheat needed it to resolve disputes.

payments to the trustee and Homeside, and modify her plan.[11]  The debtor complied with

this order, except that on the trustee's advice, she sent the September 2000 payment

directly to Homeside.

In April 2001, Homeside once again referred Osborne's file to Shapiro & Mentz

for action on an alleged February 2001 default.[12]  Wheat filed a second motion for relief

from stay on April 24, 2001.  Eventually, Osborne and Homeside agreed on the terms of

a consent order requiring Osborne to cure the post-petition mortgage defaults over time,

while at the same time making her monthly mortgage payments.[13]  If Osborne did not

perform as agreed, the consent order allowed Homeside to obtain relief from the

automatic stay *ex parte* by filing an affidavit detailing the debtor's default.

On April 24, 2002, Wheat signed and filed an affidavit[14] stating that the debtor

had breached the consent order by failing to make agreed payments, including her

February 2002 mortgage installment.  Although the affidavit recited that Wheat had

personal knowledge of the facts it set forth, Wheat had absolutely no personal knowledge

of Osborne's default.  Wheat testified at trial that she relied on her client's records for all

the information relating to Osborne's account.[15]  She testified that her practice was to

---

[11]   April 20, 2000 Order granting stay relief (P-34); September 15, 2000 order vacating April 20, 2000
Order (P-44).

[12]   April 2001 Referral (Exhibit R-15).

[13]   August 23, 2001 consent order (Exhibit M-8).

[14]   April 24, 2002 Affidavit of Default (Exhibit M-9).

[15]   Indeed, when asked at trial how she could know whether Homeside had received and negotiated
Osborne's payments, Wheat testified that she presumed her client would know.  Transcript of
September 29, 2006 hearing, p. 83, lines 1-18 (P-277).

review her client's referral, the note and mortgage, and the draft stay relief motion her staff prepared for her review, and to sign the motion if the documents all "matched."[16]

The court granted Homeside stay relief as a direct result of Wheat's submission of the affidavit.[17] Homeside later filed a petition in state court to foreclose on Osborne's home. Osborne moved to vacate the order granting stay relief,[18] and apparently also obtained a state court injunction against the foreclosure before the hearing on the motion to vacate.[19]

As of September 29, 2006, Osborne had to pay $32,507.15 in principal and accrued interest to reinstate her home mortgage loan. That total excludes late charges and other fees.

## II.   Osborne's Emotional Distress

Osborne testified she was "horrified" and "shocked" when she received notice of Homeside's first motion to lift stay in February 2000.[20] She stated that when she read the motion she began crying.[21] Homeside's second motion for stay relief, filed in April 2001, again "shocked" Osborne and caused her to feel "heartbroken."[22]

The debtor testified on direct examination that, because she was an "emotional wreck" after Homeside filed the second motion, she sought out a doctor to obtain a

---

[16]   September 29, 2006 Transcript, p. 94, lines 6-11.

[17]   May 9, 2002 order granting stay relief (Exhibit R-29).

[18]   P-97.

[19]   The debtor did not offer any written evidence of the injunction.

[20]   Transcript of February 7, 2007 hearing, p. 28, lines 20-25, p. 29, lines 1-4 (P-278).

[21]   February 7, 2007 Transcript, p. 29, lines 3-5.

[22]   February 7, 2007 Transcript, p. 33, lines 15-19, p. 35, lines 23-25, p. 36, lines 1-4.

prescription for an antidepressant.[23]   However, on cross-examination Osborne conceded

that she first visited a doctor concerning her emotional state on February 25, 2002.[24]

Osborne took the antidepressant for only a few months, claiming that she could no longer

afford it without her health insurance, which she cancelled after filing chapter 13.[25]

All this preceded the May 9, 2002 stay relief order that Homeside procured with

Wheat's affidavit.  Osborne did not know that Homeside had filed an *ex parte* affidavit

seeking stay relief on April 24, 2002, or that it had obtained an order granting default stay

relief, until Aaron McGee, her attorney at the time, informed her.[26]   The debtor testified

that she was "sick" when she eventually found out.[27]   Despite this, Ms. Osborne did not

consult her physician again until March 17, 2003, and even then did not return for a

recommended follow-up visit because she believed could not afford it.  When the debtor

did see her doctor, she did not mention her financial problems.  Ms. Osborne did not call

her physician to testify at trial,[28] or offer any other expert testimony to support her claim

for emotional distress.

---

[23]   February 7, 2007 Transcript, p. 37, lines 5-14.

[24]   February 7, 2007 Transcript, p. 84, lines 6-25.

[25]   February 7, 2007 Transcript, p. 37, lines 14-19.

[26]   February 7, 2007 Transcript, p. 41, lines 2-12.  No evidence established the date on which Osborne actually learned that Homeside had obtained stay relief.

[27]   February 7, 2007 Transcript, p. 42, lines 8-10.   Although Osborne insisted that the August 23, 2001 consent order was inaccurate, she nevertheless signed it.

[28]   Osborne testified on cross-examination that she had been embarrassed to tell the physician about her bankruptcy case.  February 7, 2007 Transcript, p. 88, lines 13-21.

Osborne testified on cross-examination that being in litigation "terrified" and "scared" her.[29] However, Homeside established that the debtor had been embroiled in proceedings in several forums at around the time of her dispute with Homeside:

(1)     Litigation with Hancock Bank on her personal guaranty of her daughter's automobile loan beginning in May 2000, which culminated in a judgment against her daughter that Osborne now is paying.

(2)     Osborne's August 2000 Louisiana attorney disciplinary board complaint against Stephen Peters, her original bankruptcy counsel.

(3)     Her malpractice lawsuit against Peters, which commenced in late April or early May 2001.

(4)     The debtor's August 2001 suit against her former husband for failing to pay child support.

Even though the debtor conceded on cross-examination that this other litigation was stressful when it was going on, she insisted that most of her stress during the period starting with her bankruptcy filing was due to her disputes with Homeside.[30]

The debtor supported her case with testimony from her only child, Katherine Osborne. The debtor's daughter, a lawyer, testified that she believes Homeside's actions were the *substantial* cause of her mother's mental distress, though perhaps not the *only* cause.[31] Katherine Osborne testified that her mother first told her about the bankruptcy and disputes with Homeside "sometime after" Mary Osborne filed chapter 13.[32]

---

[29]   February 7, 2007 Transcript, p. 89, lines 3-7.

[30]   February 7, 2007 Transcript, p. 106, lines 24-25, p. 107, lines 1-15.

[31]   February 7, 2007 Transcript, p. 127, lines 1-13.

[32]   February 7, 2007 Transcript, p. 114, lines 7-10.

Katherine was not living at home with her mother when she learned of Mary Osborne's financial problems.[33]  She stated that during this period, the debtor was anxious and depressed and had started drinking heavily.[34]

On cross-examination, Homeside's counsel clarified testimony concerning the time of Katherine Osborne's observations about her mother's demeanor.  Katherine stated that she lived in an apartment in Baton Rouge and commuted to Hammond, Louisiana to attend Southeastern Louisiana University from September 1999 until September 2000.  She returned home to live with her mother in September 2000, and resided with the debtor through August 2001, when she moved to New Orleans.[35]  From August 2001 until July 2004, Katherine Osborne lived in New Orleans while she attended Loyola Law School.[36]  She admitted that she learned much of what she knew about her mother's emotional status at that time through telephone conversations with the debtor.[37]  Katherine Osborne's testimony must be discounted to some extent because of this, and also because she understandably is sympathetic to her mother.

Aaron McGee was the debtor's only other witness.  McGee testified that Ms. Osborne was shaking and crying when she learned that Homeside had obtained stay relief

---

[33]  February 7, 2007 Transcript, p. 117, lines 18-25.

[34]  February 7, 2007 Transcript, p. 116, lines 4-15.

[35]  February 7, 2007 Transcript, p. 121, lines 9-15.

[36]  February 7, 2007 Transcript, p. 122, lines 6-9.  Katherine Osborne did state that after graduating from law school, she returned to live with her mother from about July 2004 until December 2004.  February 7, 2007 Transcript, p. 122, lines 11-17.  However, most of this period was after the Fifth Circuit issued its July 26, 2004 opinion.

[37]  February 7, 2007 Transcript, p. 123, lines 1-13.

*ex parte.* He also testified that she was most often extremely upset just before hearings.[38] However, McGee also admitted that Osborne did not miss any work throughout the course of events surrounding the debtor's dispute with Homeside.[39]

### III.    Attorneys' Fees

Aaron McGee was Mary Osborne's bankruptcy counsel from July 2, 2001 through March 22, 2006, the period during which many of these events transpired. McGee is a full-time staff attorney for the Louisiana Legislature, for which Osborne also works. In addition to handling Osborne's bankruptcy, McGee eventually undertook her representation in a lawsuit against her prior bankruptcy counsel, in her action against her former husband for past due child support, in litigation initiated by Hancock Bank, and in Osborne's state court lawsuit against Homeside.

Osborne had no hourly fee agreement with McGee, who first agreed to represent Osborne without charging any fee, although he did ask her to reimburse the costs he expended. Though Osborne later insisted on paying McGee for his time,[40] as of the hearing Osborne had paid McGee nothing for his services, except perhaps to reimburse litigation costs he had incurred.

McGee did not maintain contemporaneous records of the dates and types of services he rendered for the debtor. Rather, he testified from what he called an "after the fact" list[41] of the hours he expended in connection with Osborne's appeal of Homeside's

---

[38]    February 7, 2007 Transcript, p. 150, lines 3-21.

[39]    February 7, 2007 Transcript, p. 152, lines 8-14.

[40]    Ultimately, McGee concluded that $175 was a fair hourly rate for his bankruptcy work. February 7, 2007 Transcript, p. 141, lines 3-6.

[41]    Exhibit M-15. February 7, 2007 Transcript, p. 139, lines 9-13.

May 2002 order lifting the automatic stay.  McGee testified that the total was a conservative estimate (the witness's exact words were "way south"[42]) of the time he actually spent on the appeal.

The Steffes, Vingiello & McKenzie, L.L.C. ("Steffes Vingiello") law firm substituted for McGee as the debtor's counsel in late March 2006.  Steffes Vingiello submitted a statement for fees and costs totaling $48,707.97 for its services in connection with this motion between its enrollment and the first day of trial.[43]  The debtor's post-trial memorandum states that lawyers in the firm expended an additional 24 hours in connection with the two trial dates, including trial preparation, for an additional $5,540 in fees.[44]

## ANALYSIS

I.    Osborne's claim against Homeside and Wheat

A.    28 U.S.C. §1927

Section 1927 of title 28 empowers courts to sanction lawyers who "unreasonably and vexatiously" multiply court proceedings and assess the lawyers with "the excess costs, expenses and attorneys' fees reasonably incurred because of such conduct." Section 1927 specifically states that it applies to "any attorney or other person admitted to conduct cases in *any court of the United States*" (emphasis added).

---

[42]  February 7, 2007 Transcript, p. 140, lines 4-12.

[43]   Amended Exhibit M-17.

[44]  P-274, p.8.

1.    <u>Bankruptcy Courts are Courts of the United States under 28 U.S.C. §1927</u>

Courts are divided on the issue of whether the phrase "court of the United States" includes Article I courts such as the bankruptcy court.[45]  Although the Fifth Circuit has not addressed this question, the United States District Court for the Northern District of Texas, adopting the bankruptcy court's findings, concluded that bankruptcy courts do have authority to impose sanctions under 28 U.S.C. §1927.  *In re Western Fidelity Marketing, Inc.*, 2001 WL 34664165 at *22 (N.D. Tex. 2001), following *In re Kliegel Bros. Universal Electric Stage Lighting Co., Inc.*, 238 B.R. 531, 553 (Bankr. E.D.N.Y. 1999).  *See also In re Casiello*, 333 B.R. 571, 575 (Bankr. D. Mass. 2005) (bankruptcy courts are "courts of the United States" in part because they are units of the federal district courts).

The reasoning in these opinions is persuasive, and supports the conclusion that this court is a "court of the United States" within the meaning of 28 U.S.C. §1927.

2.    <u>Reckless Conduct is Vexatious within the meaning of 28 U.S.C. §1927</u>

Unreasonable and vexatious conduct "is harassing or annoying, or evinces the intentional or reckless pursuit of a claim, defense or position that is or should be known by the lawyer to be unwarranted in fact or law." *Cruz v. Savage*, 896 F.2d 626, 631-2 (1st Cir. 1990).  *See also Salkil v. Mount Sterling Township Police Department et al.*, 458 F.3d 520, 532 (6th Cir. 2006) (sanctions under §1927 are appropriate when "an attorney reasonably should have known that a claim pursued is frivolous") (citation omitted); *Schwartz v. Million Air, Inc.*, 341 F.3d 1220, 1225 (11th Cir. 2003) (a bad faith

---

[45]   Appellate courts have held that (1) a bankruptcy court is authorized to sanction under 28 U.S.C. §1927, *In re Cohoes Industrial Terminal, Inc.*, 931 F.2d 222, 230 (2d Cir. 1991); (2) the bankruptcy court cannot award sanctions under §1927, *In re Courtesy Inns, Ltd.*, 40 F.3d 1084, 1085-6 (10th Cir. 1994); and (3) left the question unanswered, *In re Volpert*, 110 F.3d 494, 500 (7th Cir. 1997).

determination "is warranted where an attorney knowingly and recklessly pursues a frivolous claim or engages in litigation tactics that needlessly obstruct the litigation of non-frivolous claims"). For purposes of 28 U.S.C. §1927, an attorney's reckless conduct can constitute unreasonable and vexatious multiplication of the proceedings. *Manax v. McNamara*, 842 F.2d 808, 814 (5th Cir. 1988).

The Fifth Circuit has concluded that Homeside, through its lawyer, filed an affidavit based on "faulty evidence." *In re Osborne*, 379 F.3d 277, 284 (5th Cir. 2004). The court found that Osborne was not in default at the time Homeside filed its affidavit of default. *Id*. Moreover, the court noted that "[a]ny careful *lawyer* would have known that there was no basis for default with respect to the $1,569 at issue until and unless the Consent Order – which acknowledged payment – was set aside, and it never was." *Id*. (Emphasis added). Although the Fifth Circuit did not specifically hold that Homeside or its counsel were in bad faith, it did determine that Homeside through its counsel "acted recklessly and exercised faulty judgment in asking for" the default relief. *Id*.

The evidence corroborated that conclusion. Contrary to the claim of personal knowledge Wheat made in her affidavit, Homeside's lawyer lacked any personal knowledge of Osborne's default. Wheat testified at trial that she had no reason to doubt the accuracy of Homeside's records, but that misses the point. The affiant, without any personal knowledge, signed the affidavit in support of stay relief declaring that Osborne had defaulted on her debt to Homeside. Her signature on the affidavit of default made her a fact witness to the debtor's alleged failure to comply with the consent order. Wheat again insisted at the September 17, 2002 hearing on the debtor's motion to vacate the order granting relief from stay that the debtor's account remained in default, in the exact

amount – $1,569 – that the debtor had paid, according to the August 23, 2001 consent order.[46]

Wheat's signing and filing the affidavit of default, and later insisting on its accuracy, were based not on her personal knowledge or even accurate facts. She should have known the affidavit would lead to an order granting relief from the automatic stay. In pressing this claim, Wheat was at least reckless, as the Fifth Circuit recognized. A creditor's counsel's submission of its own affidavit in support of relief in the manner done here is arguably impermissible[47] and, as this dispute illustrates, definitely perilous. Lawyers should not routinely serve as fact witnesses for their clients, even on typically uncomplicated matters including alleged defaults relating to adequate protection orders in chapter 13 cases.

In sum, Stacy Wheat unreasonably pursued a claim that she reasonably should have known had no factual support, and compounded that by resisting the debtor's motion to vacate the May 9, 2002 order granting stay relief. Her conduct merits sanctions under 28 U.S.C. §1927.

---

[46]   Transcript of hearing held September 17, 2002, p. 8, lines 1-23, p. 9, lines 1-2 (P-117).

[47]   Rule 3.7 of the Rules of Professional Conduct, La R.S. 37:222, Chp. 4 App., La. State Bar Assoc. Artcicles, Art. 16, states that:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
>> (1) the testimony relates to an uncontested issue;
>>
>> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>>
>> (3) disqualification of the lawyer would work substantial hardship on the client.

B.     11 U.S.C. §105

Section 105(a) of title 11 empowers bankruptcy courts to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title . . . or to prevent an abuse of process." It grants bankruptcy courts broad authority to implement the Bankruptcy Code and prevent abuses of bankruptcy process, powers inherent to district courts, as the Supreme Court recognized in *Chambers v. NASCO, Inc.*, 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991). *See In re Rainbow Magazine*, 77 F.3d 278, 284 (9th Cir. 1996) ("By providing that bankruptcy courts could issue orders necessary 'to prevent an abuse of process,' Congress impliedly recognized that bankruptcy courts have the inherent power to sanction that *Chambers* recognized exists within Article III court"); *In re Courtesy Inns*, 40 F.3d 1084, 1089 (10th Cir. 1994) ("We believe, and hold, that §105 intended to imbue the bankruptcy courts with the inherent power recognized by the Supreme Court in *Chambers.*") Moreover, pursuant to section 105, bankruptcy courts have the power to sanction "both *parties and counsel* who willfully abuse the judicial process." (Emphasis added.) *In re Knepper*, 154 B.R. 75, 80 (N.D. Ind. 1993). *See also In re Gervin*, 337 B.R. 854, 856-7 (Bankr. W.D. Tex. 2005) (Section 105 gives courts statutory authority to hold parties in civil contempt and sanction them); *In re Regensteiner Printing Co.*, 142 B.R. 815, 819 (N. D. Ill. 1992) ("[P]ursuant to 11 U.S.C. §105 bankruptcy courts are empowered to impose sanctions on parties and counsel who willfully abuse the judicial process").

In its *Osborne* opinion, the Fifth Circuit succinctly described Homeside's conduct in connection with the motion to lift stay based on an alleged default in the August 23, 2001 consent order:

> It seems disingenuous to claim that Osborne did not pay
> what she owed when it is Homeside that has a history of
> not cashing and returning valid checks.  Homeside simply
> cannot refuse to negotiate Osborne's checks, then blame her
> for knowing they were not negotiated, and call it a default.

*Osborne*, 379 F.3d 277 at 283.  Nothing in the trial testimony of the representative of

Washington Mutual (Homeside's successor), or in any other evidence, contradicts the

Fifth Circuit's conclusion regarding Homeside's actions.  Accordingly, Osborne proved

that Homeside and its counsel, Stacy Wheat and Shapiro & Mentz, willfully abused the

bankruptcy process and that sanctions are appropriate under 11 U.S.C. §105.

II.    <u>Sanctions</u>

A.    <u>Emotional distress damages</u>

Although the Fifth Circuit has not decided whether a bankruptcy court can award

damages for emotional distress as an element of a sanctions award under 11 U.S.C. §105,

the First Circuit Bankruptcy Appellate Panel has affirmed an award of emotional distress

damages for a violation of the discharge injunction in 11 U.S.C. §524.  *In re Torres*, 309

B.R. 643, 648 (1st Cir. B.A.P. 2004) ("such damages are compensable based upon the

[broad] sweep given §105 by the First Circuit").  *See also Gervin*, 337 B.R. at 858-9

(bankruptcy court has power to award emotional distress damages for discharge

injunction violation as part of its power to sanction contempt pursuant to 11 U.S.C.

§105).

Although *Torres* and *Gervin* relied on 11 U.S.C. §§524 and 105 to impose

sanctions for aggressive creditor collection activity post-discharge, by analogy they

support a bankruptcy court's award of emotional distress damages to protect debtors

against an abuse of process.

Recognition that the bankruptcy court can sanction an errant party for causing a debtor's emotional distress is not the end of the analysis. Although Mary Osborne as a matter of law may have a claim for emotional distress damages, she must prove those damages. The Fifth Circuit stated in *Hitt v. Connell* that

> [H]urt feelings, anger and frustration are part of life, and are not the types of emotional harm that could support an award of damages. The plaintiff must instead present *specific* evidence of emotional damage: "[T]here must be a 'specific discernable injury to the claimant's emotional state,' proven with evidence regarding the 'nature and extent' of the harm." To meet this burden, a plaintiff is not absolutely required to submit corroborating testimony (from a spouse or family member, for example) or medical or psychological evidence. The plaintiff's own testimony, standing alone, may be sufficient to prove mental damages but only if the testimony is "particularized and extensive" enough to meet the specificity requirement discussed above: "Neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a [sic] violation occurred supports an award of compensatory damages.'"

301 F.3d 240, 250-251 (5th Cir. 2002) (citations omitted).

The debtor's claim rests solely on her testimony and the testimony of her daughter and her lawyer. The evidence was not especially compelling. For example, Osborne testified that she sought medical treatment for emotional distress as a result of Homeside's actions. But she first consulted a physician in February 2002, two years *after* Homeside filed its first motion for relief from the automatic stay. She saw her physician only one other time: in March 2003, nearly a year *after* she learned that Homeside had obtained stay relief based on the affidavit of default. Osborne also admitted that she stopped taking anti-depressants shortly after her doctor first prescribed them, and has taken them only sporadically since then. Moreover, the evidence established that

Osborne did not miss any work.  In combination, this evidence undermines the severity of emotional distress Osborne claims to have endured.

The evidence also casts doubt on the primacy of the role that Osborne contends Homeside's actions played in her emotional state.  The debtor testified that since she filed bankruptcy in 1999, she had been involved in several other legal and quasi-legal proceedings.  The number of the proceedings, combined with the debtor's financial difficulties, make it less likely that Homeside's and its counsel's actions, alone, triggered Osborne's emotional distress, despite her insistence that the other proceedings did not have any bearing on her emotional state.

Finally, Aaron McGee represents Ms. Osborne in other proceedings, including a state court lawsuit against Homeside.  Although he no longer serves as her counsel in this matter, his testimony is subject to bias.[48]  Additionally, McGee's role in the proceedings leading to the appeal supports discounting to some extent his testimony favoring Ms. Osborne's claim.

Osborne was not required to offer expert testimony, or even corroborating evidence, to support her claim of emotional distress resulting from Homeside and Wheat's actions.  However, the lack of that evidence, as well as the bias of all the witnesses whose testimony the debtor did offer in support of the claim, poses a proof problem.  *Hitt* requires that a party claiming emotional distress damages prove a "specific discernable injury" to her emotional state.  The evidence supports a finding that the debtor's emotional distress began when her financial problems began, long before Wheat

---

[48]   Whether this ruling will have any effect on Osborne's pending state court claims is uncertain, though a ruling in Osborne's favor may confer an advantage in the state court litigation, where McGee represents the debtor on a contingent fee basis.

filed the default affidavit.  However, Osborne did establish that Homeside and Wheat's affidavit and their actions to obtain stay relief contributed to and prolonged her emotional distress.  Consequently, the court awards the debtor $5,000 in emotional distress damages from Homeside, Wheat and Shapiro & Mentz as a sanction under 11 U.S.C. §105.

B.    Attorneys' Fees

Osborne also seeks attorneys' fees and costs.  Section 1927 of title 28 allows courts to award attorneys' fees and expenses against the offending attorney – though not its client.  Additionally, the court can impose attorneys' fees as a sanction for abuse of process pursuant to its inherent power and 11 U.S.C. §105.  *Volpert*, 110 F.3d at 500, citing *In re Arkansas Communities, Inc*., 827 F.2d 1219, 1221-22 (8th Cir. 1987).  Thus, Osborne is entitled to recover reasonable attorneys' fees and costs.

In *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), the Supreme Court directed federal courts to make an initial estimate of reasonable attorney's fees by applying prevailing hourly billing rates to the hours reasonably expended on successful prosecution of claims, the so-called "lodestar approach." *See also Blum v. Stenson,* 465 U.S. 886, 888, 104 S.Ct. 1541, 1544, 79 L.Ed.2d 891 (1984) ("[t]he initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate.") Homeside and Wheat contend that the debtor is not entitled to recover attorney fees for services rendered by McGee, who did not keep time records.  They also argue that the fees of Steffes Vingiello, which substituted for McGee as debtor's counsel, are excessive.

1.    McGee's Fees

Aaron McGee testified that he initially agreed to represent Osborne at no charge, because he believed that he could resolve her problems in a single hearing.  Later, the debtor signed a contingent fee agreement, anticipating that the Homeside dispute would be resolved in state court.[49]  McGee did not keep contemporaneous time records of his work in connection with the Homeside dispute.  For trial he prepared, largely from memory, a statement of the time he expended.[50]  Homeside attacks the absence of contemporaneous time records, but the Fifth Circuit has held that contemporaneous time records are not indispensable to an attorney's fee award.  *Dennis v. Warren*, 779 F.2d 245, 249 (5th Cir. 1985).  While it is difficult to *accurately* reconstruct specific and complete time records going back four years, given the many events in the debtor's dispute with Homeside, this does not render McGee's records worthless.

McGee represented the debtor through the morass of litigation stemming from her mortgage disputes with Homeside and, although he made some missteps, he achieved a successful outcome.  Indeed, McGee successfully appealed the 2002 order lifting the stay, his first bankruptcy appeal.  McGee's fees from September 2002 through March 22, 2006 total $ 23,528.75 for 134.45 hours of work.  He also incurred a transcription cost of $150.[51]

An hourly rate of $175 for McGee is reasonable for an attorney with limited bankruptcy experience.  However, the court will reduce by approximately one-fourth, or 34 hours, the number of hours McGee says he invested in the litigation, due to the lack of

---

[49]   McGee testified that Osborne's state court lawsuit against Homeside is now stayed.

[50]   McGee testified that he had some written records – mainly calendar notes – of time he spent on the project.  He relied on those notes to help him reconstruct the time he spent on the case.

[51]   Mover's Exhibit M-15.

contemporaneous time records and the excessive time he spent on certain tasks, such as preparing for bankruptcy court appearances, preparing for oral argument in the Fifth Circuit and even preparing for status conferences. Therefore, the court awards McGee fees totaling $17,578.75, representing 100.45 hours at $175 per hour, plus $150 in costs.

2.    <u>Steffes Vingiello's Fees</u>

Steffes Vingiello, who replaced McGee as Osborne's counsel, is an experienced bankruptcy firm. It took over the debtor's case after settlement efforts failed. Steffes Vingiello faced Homeside's repeated efforts to dismiss the debtor's sanctions motion, or at least to pare down the grounds upon which Osborne sought relief, in addition to discovery requests and evidentiary motions. Although Steffes Vingiello expended many more hours in a shorter period of time than McGee, its request for more than $54,000 in fees is excessive. The court will reduce by one-half the sums sought for time spent performing legal research; will reduce by one-half the hours spent in trial preparation for the first day of trial on the sanctions motion; and will disallow all fees sought for time billed before Steffes Vingiello enrolled as debtor's counsel. The total reduction is $30,000. Accordingly, the court awards $24,247.97 in attorneys' fees and costs for Steffes Vingiello's services.

CONCLUSION

Stacy Wheat, as counsel for Homeside, merits sanctions for the prosecution of Homeside's request for default stay relief against the debtor, Mary Osborne, under 28 U.S.C. §1927. Wheat, Shapiro & Mentz and Homeside merit sanctions under 11 U.S.C. §105 and *Chambers v. NASCO, Inc.* for seeking the default stay relief. Therefore, the court awards sanctions against Wheat, Shapiro & Mentz and Homeside, jointly and

severally, totaling $46,976.72, comprising $5,000 for the debtor's emotional distress;

$17,728.75 in attorneys' fees and costs for Mr. McGee's services; and $24, 247.97 for

Steffes Vingiello's services.

Baton Rouge, Louisiana, September 14, 2007.

<u>**s/ Douglas D. Dodd**</u>
DOUGLAS D. DODD
UNITED STATES BANKRUPTCY JUDGE